1          UNITED STATES BANKRUPTCY COURT
2                DISTRICT OF DELAWARE

3   IN RE:                        .  Chapter 11
                                  .  Case No. 24-10956 (CTG)
                                  .
4   APPGATE, INC., *et al.*,      .  (Jointly Administered)
                                  .
5                                 .  Courtroom No. 1
                                  .  824 North Market Street
6              Debtors.           .  Wilmington, Delaware 19801
                                  .
7                                 .  Monday, June 17, 2024
8   . . . . . . . . . . . . . . . .  1:00 p.m.

9                TRANSCRIPT OF HEARING
         BEFORE THE HONORABLE CRAIG T. GOLDBLATT
10            UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:         Patrick Reilley, Esquire
                             COLE SCHOTZ P.C.
13                           500 Delaware Avenue, Suite 1410
                             Wilmington, Delaware 19801
14
                             Derek Hunter, Esquire
15                           KIRKLAND & ELLIS LLP
                             KIRKLAND & ELLIS INTERNATIONAL LLP
16                           601 Lexington Avenue
                             New York, New York 10022
17

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:          Alice Doody, ECRO

21  Transcription Company:   Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email:  gmatthews@reliable-co.com

24
    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.

1  <u>APPEARANCES (CONTINUED)</u>:

2  for the U.S. Trustee:      Linda Casey, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
3                             844 King Street, Suite 2207
                              Lockbox 35
4                             Wilmington, Delaware 19801

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2   MOTION:                                              PAGE

3   Agenda
4   Item 8: Joint Prepackaged Plan of Reorganization      4
             of Appgate, Inc. and Its Debtor
5            Subsidiaries Pursuant to Chapter 11 of
             the Bankruptcy Code (Filed May 6, 2024)
6            [Docket No. 15]

7            Court' Ruling:                               51

8

9   DECLARATIONS:                                        PAGE

10  1) Thomas Studebaker                                  10

11  2) John Burlacu                                       11

12  3) Steven Panagos                                     12

13  4) Adam Waldman                                       12

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commenced at 1:00 p.m.)

2           THE COURTROOM DEPUTY:  All rise.

3           THE COURT:  Please be seated.  Good afternoon.  We

4   are here in In Re Appgate, which is Case No. 26-10956.

5           Mr. Reilley.

6           MR. REILLEY:  Good afternoon, Your Honor. Patrick

7   Reilley from Cole Schotz on behalf of the debtors.  Your

8   Honor, I am joined by my co-counsel from Kirkland & Ellis,

9   Christopher Marcus, who is with me at counsel's table, Derek

10  Hunter, we also have Maddison Levine, Brian Nakkaimousa, we

11  have Nate Felton and Jennifer Davis.  We are also joined, in

12  the back of the courtroom, by summer associates from Kirkland

13  & Ellis.

14          THE COURT:  Welcome to Wilmington, everyone.

15          MR. REILLEY:  Your Honor, turning to the agenda,

16  the only matter scheduled is confirmation.  As noted in the

17  agenda, all informal responses have been resolved.  There is

18  one pending open objection which is the objection filed by

19  the United States Trustee.  We do thank Ms. Casey, though,

20  over the last few days for trying to work with us to resolve

21  narrow issues, but there are some open matters that we will

22  address with the Court.

23          In terms of proceeding, Mr. Hunter will be

24  presenting confirmation.  So, with that, I would propose to

25  just cede the podium to Mr. Hunter.

1          THE COURT:  Okay.  Very well.

2          MR. REILLEY:  Thank you, Your Honor.

3          THE COURT:  Thank you, Mr. Reilley.

4          Mr. Hunter.

5          MR. HUNTER:  Good afternoon, Your Honor.  For the

6  record Derek Hunter of Kirkland & Ellis on behalf of the

7  debtors.

8          We are here today, really, with one item, the

9  combined hearing on the adequacy of the disclosure statement

10 and confirmation of our Chapter 11 plan.  Before we hop in, I

11 will try not to be too redundant with the thanks, but I did

12 want to thank Your Honor and your Chambers for, you know, not

13 only all the paper we've been dropping on you Friday

14 afternoon and then again today, apologies and thanks for

15 that, but also just allowing this case to move smoothly.

16 Other then the first day hearing, everything we have needed

17 to get from there to here has been entered under CNO and we

18 appreciate the Court's accommodation.

19         THE COURT:  Its all of you who have made it easy

20 for me.  I have done nothing but entered agreed orders.  So,

21 I don't think I get that much thanks.  I am happy to do my

22 job.

23         MR. HUNTER:  Thank you, Your Honor.

24         I also wanted to briefly thank our RSA parties.

25 Of course, as we mentioned, the first day that a cornerstone

1  of these cases. A lot of parties, including Magnetar, our DIP

2  lender and 1L lender, and their counsel from Willkie Farr and

3  Young Conaway; we appreciate their efforts to get us here

4  today.  Then finally, while we will have a little bit of

5  argument later, I do need to thank Ms. Casey and the Office

6  of the United States Trustee.  She has worked with us really

7  hard to narrow everything we could to open only what really

8  has to be for Your Honor today.

9         So, just logistically we have a presentation. If

10  it's okay with Your Honor I will flip through an overview of

11  where we are, how we got here, confirmation, and then we can

12  handle argument at the back half if that works for Your

13  Honor.

14         THE COURT:  Certainly.

15         MR. HUNTER:  So, Your Honor, we're today, of

16  course, as we mentioned, on confirmation.  We filed a few

17  versions of the confirmation order and plan at this point

18  and, spoiler alert, there will be one more iteration to

19  resolve one final issue with the Office of the United States

20  Trustee.  Just for the record, our disclosure statement was

21  at Docket No. 16, and then the second amended plan was at

22  Docket No. 150, and then the proposed confirmation order was

23  at Docket No. 152, and then there will be a subsequent

24  version of both of those filed.

25         THE COURT:  Okay.  I saw one just before getting

1   on the bench, is that the one you are talking about or is the

2   one that's following that?

3          MR. HUNTER:  I mean the team works fast, that may

4   be the one I'm talking about, Your Honor, and so we can -- we

5   will take a look at it as we're going through this and we

6   will flag the last remaining issue there.

7          THE COURT:  Terrific.  Very well.  Thank you, Mr.

8   Hunter.

9          MR. HUNTER:  So, Your Honor, you know, I think the

10  highlights from the debtors' perspective are relatively

11  unchanged from when we were here on the first day which is we

12  have unanimous support from our voting creditors.  We had

13  that prepetition and coming into these cases.  We have an RSA

14  with broad support across our capital structure and that

15  support is for a completely deleveraging transaction that

16  leaves the debtor with no debt on their balance sheet.

17         We were funded with an $18 million DIP facility;

18  $10 of which will come effectively on the effective date as

19  equity, Your Honor, because the DIP is converting to equity.

20  So, we think there is great support for a transaction that is

21  clearly in the debtors' best interest and is going to set the

22  company up to be successful post-emergence.

23         Just quickly, on the voting results, as a reminder

24  unanimous support from voting creditors, you know, since the

25  first day hearing and today, of course, there was an opt-out

1  process.  We are going to be talking more about that today,

2  but creditors did opt-out.  We have a relatively closely held

3  capital structure, but, you know, parties did opt-out and we

4  think that indicated that the opt-out procedures worked, that

5  the notice that we sent to creditors was clear and that they

6  had the opportunity to either use the form to opt-out or

7  object on the docket and there was a plain English

8  description, there was the legalize description, and parties

9  had the information they needed to opt-out as indicated by

10  the opt-out results.

11        Just as a summary, Your Honor, again, the

12  treatment under the plan, the DIP claims, the 1L claims, and

13  the 2L claims are going to be equitized and those will be the

14  new owners in reorganized Appgate.  Our Class I and Class II

15  claims, other secured and priority claims, are unimpaired by

16  the plan, general unsecured creditors, which are critical to

17  the company's success, obviously, are vendors, contract

18  counterparties, etc., are unimpaired and then the 3L RCF

19  claims and equity will be discharged by the plan.

20        Your Honor, our declarants for today and with

21  thanks again for accommodating, you know, we worked with the

22  Office of the United States Trustee to get to a point where

23  we don't expect any cross.  So, we appreciate these folks

24  being allowed to appear by Zoom to save them some trouble,

25  but also, you know, the estates some money.

1          So, just to walk through who our declarants are

2   today we have Mr. Steven Panagos, a disinterested director

3   and a member of the special committee of Appgate, Inc.  We

4   filed his declaration at Docket No. 149. Mr. Tom Studebaker,

5   co-head and managing director of Triple P RTS, the debtors'

6   financial advisor.  We filed his declaration at Docket No.

7   143.  Next Mr. Adam Waldman, the managing director of Triple

8   P Securities, LLC, the debtors' investment bank.  We filed

9   his declaration at Docket No. 142.  Then Mr. John Burlacu,

10  senior director of Donlin Recano & Co., the debtors

11  solicitation agent with a declaration at Docket No. 144.

12          Your Honor, I would like to now move these

13  declarations into evidence, but we do have a couple

14  resolutions with the Office of the United States Trustee on

15  what form these declarations will come in, so just bear with

16  me.

17          THE COURT:  Okay.

18          MR. HUNTER:  If I could start with Mr.

19  Studebaker's declaration at Docket No. 143, I would like to

20  move that into evidence except for the last sentence of

21  Paragraph 11 and the last sentence of Paragraph 14.  That is

22  based off of a resolution with the Office of the United

23  States Trustee.

24          THE COURT:  Okay.  Is there any objection to the

25  introduction into evidence of Mr. Studebaker's declaration,

1  which is at D.I. 143, except for the last paragraphs of --

2  last sentences of Paragraphs 11 and 14.

3       (No verbal response)

4       THE COURT:  Seeing none, the remaining portions of

5  the declaration will be admitted into evidence.

6       (Studebaker declaration received into evidence)

7       THE COURT:  Is there any party in interest that

8  wishes to cross-examine Mr. Studebaker?

9       (No verbal response)

10      THE COURT:  Okay.  So, seeing none you can

11 proceed, Mr. Hunter.

12      MR. HUNTER:  Thank you, Your Honor.

13      Next, as to Mr. Burlacu's declaration, that is at

14 Docket No. 144, I would like to move that into evidence as

15 well except for the third to last and the second to last

16 sentence of Paragraph 14.  Then in addition to the

17 declaration itself, just a short proffer from Mr. Burlacu. If

18 he were -- he is on the Zoom line, of course, and available

19 to testify or to be crossed, but if he were to testify Mr.

20 Burlacu, in addition to his declaration, would testify to the

21 fact that there were not any opt-outs received after the June

22 7th opt-out deadline.

23      THE COURT:  Okay.  So, first, is there any

24 objection to the introduction into evidence of Mr. Burlacu's

25 declaration save for the second and third to last sentences

1  of Paragraph 14?

2      (No verbal response)

3        THE COURT:  Okay.  The declaration will be

4  admitted.

5      (Burlacu declaration received into evidence)

6        THE COURT:  Is there any objection to the Court

7  taking into evidence the proffer that there were no opt-outs

8  after the June 7th opt-out deadline?

9      (No verbal response)

10        THE COURT:  So, the proffer will be accepted.

11        Is there any party in interest that wishes to

12  cross-examine Mr. Burlacu?

13      (No verbal response)

14        THE COURT:  So, seeing none, Mr. Hunter, you can

15  proceed.

16        MR. HUNTER:  Thank you, Your Honor.

17        Then with the final two declarations, luckily, no

18  caveats there.  We would ask that that the Waldman

19  declaration at Docket No. 142 and the Panagos declaration at

20  Docket No. 149 be admitted into evidence as well.

21        THE COURT:  Okay.  Is there any party in interest

22  that objects to the admission into evidence of the

23  declarations of Mr. Panagos and Mr. Waldman at D.I. 149 and

24  142?

25      (No verbal response)

1          THE COURT:  Okay.  Seeing none, they will be

2    admitted.

3          (Panagos declaration received into evidence)

4          (Waldman declaration received into evidence)

5          THE COURT:  Is there any party in interest that

6    wishes to cross-examine either of those declarants?

7          (No verbal response)

8          THE COURT:  Okay.  Seeing none, you can proceed.

9          MR. HUNTER:  Thank you, Your Honor.

10          Just quickly, before we get to the formal

11    objections, we did receive some informal objections and

12    comments from stakeholders.  You know, the slide lays them

13    out.  The Texas Taxing Authority, the SEC and the DOJ we were

14    able to resolve the informal objections with language either

15    to the plan or the confirmation order.  The U.S. Trustee, we

16    had a lot of comments from their office as well, we worked

17    through those, and were able to resolve the vast majority of

18    them with only a few left here for today.

19          THE COURT:  Terrific.  I do want to just say

20    thanks to all of the parties to the extent folks, obviously,

21    addressed language issues and reached informal objections

22    that does make my job easier and I don't want to take that

23    for granted, particularly the work done where there are

24    remaining issues but you focus the hearing on what are the

25    real issues.  That makes my job much easier and I really do

1  appreciate that. And I want however I resolve the disputed

2  issues and I do want it to be clear how much I appreciate the

3  efforts to focus the hearing on those.

4          MR. HUNTER:  Thank you, Your Honor.

5          Further to that point, you know, we filed a lot of

6  paper. I think we will let our pleadings do most of the

7  talking on the case in chief, the 1129 factors, why we think

8  the disclosure statement satisfies the applicable standards.

9  We have a few slides here, for the record, that just help

10 organize where in the evidence you can find the support,

11 where in the brief you can find the argument.

12         Suffice it to say, we think both the disclosure

13 statement contains adequate information.  It contains the

14 type of information courts look to determine whether a

15 disclosure statement has adequate information and we also

16 think the plan satisfies the 1129 factors. You know, we

17 walked through those in detail through the pleadings and I

18 will not plan to go through them in detail.

19         Unless Your Honor has any questions, I would

20 propose to turn the argument on the U.S. Trustees issues.

21         THE COURT:  Okay. I will say, just to the extent

22 its helpful, obviously, if anyone wants to get up and talk

23 about anything I will hear you, but I have reviewed the plan,

24 and the disclosure statement, and the confirmation brief.

25 With respect to the matters that are not contested I don't

 1  have independent questions and I'm satisfied with where we

 2  are.

 3          MR. HUNTER:  Thank you, Your Honor.

 4          So, with that, turning to the objections, just the

 5  one from the United States Trustee, you know, they've been

 6  focused since the pleading was filed on Friday. I think there

 7  were two issues in particular.  One, as it relates to whether

 8  the plan is a 9019 settlement and then the breadth of the

 9  exculpation. I believe we have resolved those objections.  As

10  to the 9019 issue that was with language in the plan filed

11  Friday and I think we just need to carry over some conforming

12  changes to the confirmation order which we were doing or --

13          THE COURT:  And that's what I -- I did see where

14  it refers to as agreed as among the effected constituencies.

15          MR. HUNTER:  Exactly.

16          THE COURT:  That language makes good sense.  That

17  strikes me as totally appropriate and I am comfortable there.

18          MR. HUNTER:  Perfect.  So, that is the resolution

19  on the 9019.

20          Then on exculpation, again, a conforming change in

21  the confirmation order and the plan that those are being

22  filed today.  We just resolved that issue and so I think that

23  one is off the table as well.

24          THE COURT:  Oh, okay.  The exculpation issue.  In

25  terms of when the exculpation period begins, just to give

1  away the punchline, what is the answer to that question?

2          MR. HUNTER:  I think if we had to completely

3  answer that for all time we would be arguing.  The way we

4  solved it is just by referencing 1125 and that the debtors,

5  the fiduciaries, their getting the protections that 1125

6  offer, whatever those may be.  So, there is language to that

7  effect that will be added to the confirmation order and the

8  plan.  We could flip that up once we have the redline if that

9  is helpful.

10          THE COURT:  No, that language is -- I'm fine with

11  coming back to argue another day about what exactly we have

12  done today.  That doesn't offend my sensibilities.

13           Can I ask this question, I'd be more comfortable

14  with that if I thought this is -- that the claims against

15  which are being exculpated are entirely hypothetical claims

16  and that you're not aware that someone is out there ready to

17  file a lawsuit tomorrow.  Can I ask you is that assumption a

18  correct assumption?

19          MR. HUNTER:  That is a correct assumption, Your

20  Honor.

21          THE COURT:  Okay.  Fair enough.  That is helpful.

22          MR. HUNTER:  Yes.  We will get -- it's a good

23  segway to what are the live issues.  You know, we, obviously,

24  ran an opt-out process and, you know, we think that was

25  consensual.  We will talk about why that it is.  It gave

1  parties the opportunity to opt out, raise objections, nobody

2  did.  We also did an independent investigation with the

3  special committee that looked at all claims and causes of

4  action that belonged to the debtors.

5           The Panagos declaration has the conclusion there

6  which is there was nothing that was found that was worthy of

7  pursuit.  So, we are not aware of anything which sometimes

8  makes it helpful to resolve those issues because its really

9  just lawyers thinking through issues.  We are not sure there

10 will be a real-world impact particularly on exculpation, Your

11 Honor.

12           THE COURT:  Okay.  That is helpful.  Thank you.

13           MR. HUNTER:  So, just quickly on opt-out this is,

14 you know, one of the first issues from the U.S. Trustees

15 objection.  This comes up a lot between debtors and the

16 Office of the United States Trustee, a lot of good faith

17 debate on this one.  Despite the frequency with which its

18 argued, the intellectual underpinnings, you know, why we have

19 opt-out, why we have opt-in, frankly, is a little bit muddled

20 in the law, I think.  If you look at the different

21 justifications from different courts, is it a matter of

22 contract, is it consent, and acceptance.

23           THE COURT:  Except if you look only at things I've

24 written you'd reach the same conclusion that it's a little

25 bit muddled.

1          MR. HUNTER:  Yes.  So, I'm going to be accused of

2    engaging in flattery from the bench, Your Honor, and then

3    taking the risk of citing you back to yourself, but I do

4    think Your Honor's opinion in <u>Arsenal</u> is a very good

5    comprehensive overview of that debate and, you know, easy for

6    me to say, right, but I think the right justification for why

7    we do opt-outs --

8          THE COURT:  Have you been talking to my mother

9    about am I right.

10         (Laughter)

11         MR. HUNTER:  You know, it's just persuasive, Your

12   Honor.  I think there was that inconsistency, even in

13   Delaware, right.  Chief Judge Sontchi -- former Chief Judge

14   Sontchi, you know, was on the record on this point having a

15   similar view, I think. I'm not aware of a written opinion,

16   but at least in transcripts before him he came down pretty

17   clearly of the view its not a contract issue.  We can stop

18   trying to fit that square peg in that round hole and its

19   really a matter of due process and notice.  You know, our

20   system is an adversarial system.  People have to come forward

21   and if they don't we can evidence consent from that

22   particularly where there is an opt-out process.

23         So, that is what the debtors did here.  You know,

24   we think everything was conspicuous, well noticed.  We will

25   talk about it when we get to the end a little bit in some of

1   the disclosure objections, but not only did we have the full

2   text of the releases, who was being released, how you could

3   opt-out, we had a plain English version for those less

4   sophisticated stakeholders to hopefully help boil it down and

5   cut to the chase about what was at stake.

6           So, we think, for the reasons you have laid out in

7   Arsenal and in our briefing, and just the process we followed

8   here and how its consistent with other cases, the opt-out was

9   appropriate in this case.

10          This is more to that, Your Honor, just there was

11  30 days for folks to opt-out.  The instructions were clear.

12  I know Your Honor was clear to say in Arsenal, while I'm not

13  setting down a rule for all cases, you know, its going to be

14  dependent on the facts.  I think if anything, the facts here,

15  if they're atypical, its because of the atypical consent and

16  support from stakeholders and lack of objections we have

17  here.

18          Turning to the second release argument, Your

19  Honor, from the Office of the United States Trustee its

20  really about, you know, a carve out for fraud, willful

21  misconduct, and gross negligence.  I think just starting from

22  the premise in the U.S. Trustees objection on why its

23  inappropriate, equating a release to a discharge we think

24  that is the wrong analogy, Your Honor.  Release is distinct

25  from a discharge.

1          Your Honor is going to, you know, if you confirm

2    the plan, discharge everything that the plan says is

3    discharged regardless of whether every single stakeholder

4    likes it because, you know, in that case we would have

5    satisfied the 1129 factors and you don't need everyone to be

6    supportive, you only need the requisite consents and you need

7    to find that it satisfies the 1129 factors, but then you can

8    discharge everything else.

9          Release, at least in this case, is a matter of

10   consent and so as far as third parties we think because of

11   the reasons we describe on the opt-out they have consented.

12   As to the debtor release it was the subject of an independent

13   thorough investigation.  We didn't just look at certain

14   claims and causes of action, the special committee looked at

15   all potential claims and causes of action, did not find any

16   worth pursuing and so for that reason, you know, a broad

17   release without a carve-out was appropriate, we think, and

18   consistent with the deal struck in the RSA.

19          THE COURT:  So, just to make sure that I -- and I

20   should have focused on this question beforehand, but in terms

21   of the scope of the release, what is released, I take it its

22   limited to liability of the third party to the extent they

23   would be liable on account of the debtors conduct.

24          MR. HUNTER:  Correct. It's all -- the point is to

25   be a full employee release.  To the extent it relates to

1  these debtors and things that happened before the effective

2  date related to these debtors, specific transactions, etc.,

3  its not everything that is possibly imaginable even the

4  release and releasing parties. And I know the Office of the

5  United States Trustee likes to point out the breadth of those

6  definitions. They are all tied back to how those definitions

7  start and how the releases start which is in your capacity as

8  some party related to these debtors and released from claims

9  that somehow relate to these debtors.  That is what we are

10 really trying to achieve here.

11             THE COURT:  Okay.

12             MR. HUNTER:  Final point, Your Honor. I think we

13 lost the presentation, but that's okay.  The disclosure

14 related objections I think they get to the substance of the

15 releases. Its really that these releases were really broad

16 and, you know, it shouldn't be appropriate to make parties to

17 opt out.  For the reasons I have already described, I think

18 that is the incorrect view and, you know, we did something

19 that you don't see a lot of other debtors do which is take

20 efforts to create a -- sometimes lawyers are afraid to stray

21 from the exact legal words and make it plain English for

22 folks, but the notices that we sent to the unimpaired and the

23 impaired deemed to reject creditors we put a plain English

24 qualifier right up front that we have used in some other

25 cases that helps describe, in clear terms, for maybe less

1  sophisticated individuals, you know, what the releases do,

2  what the impact is, the fact that you can opt-out, if you are

3  unimpaired you can opt-out and you will still be unimpaired.

4  Don't worry, its not going to hurt your claim if you decide

5  to opt out. All that was laid out.

6           Again, in this case we have a 100 percent support

7  across the debt structure.  89 percent of those parties are -

8  - 89 percent of our equity owners are also supporting, you

9  know, another 5, 6 percent of that is one large holder.  So,

10 the universe of small retail shareholders, so to speak, is

11 very small and this is an over-the-counter traded company.

12 Its not like it's on the NASDAQ and anyone can just open a

13 Robinhood account and buy Appgate, right. It takes people

14 that really had intent and focus on this name.

15           So, I think for all those reasons the disclosure

16 was appropriate, the opt-out was appropriate, and the plan

17 should be confirmed with the releases as set forth in the

18 plan and confirmation order, Your Honor.

19           THE COURT:  Thank you very much.

20           MR. HUNTER:  I think that is its as far as the

21 presentation from my perspective. I am happy to answer any

22 questions Your Honor has or cede the podium to Ms. Casey.

23           THE COURT:  I think I'm interested in hearing from

24 Ms. Casey and then maybe I can come back to you and see how

25 we go.

1          MR. HUNTER:  Thank you, Your Honor.

2          THE COURT:  Thank you very much.

3          Ms. Casey.

4          MS. CASEY:  Good afternoon, Your Honor.  Linda

5    Casey on behalf of the United States Trustee.

6          I would like to actually start first with the

7    answer to the last question.  The release says that each

8    party is released, and I'm going to assume all the dot, dot,

9    dots, from all causes of action whatsoever, known or unknown,

10   that they would have been entitled to assert in their own

11   right based on or relating to the debtors, including the

12   business or contractual agreements between any debtor and any

13   release party, and any other transaction agreement related to

14   the above.

15         So, this would release, for example, since its not

16   limited to the Chapter 11 case and the solicitation, if a

17   contract counterparty had a guarantee from a non-debtor

18   affiliate that non-debtor affiliate would be released from

19   that guarantee under the plain language of this because it

20   relates to the contractual relationship between the --

21         THE COURT:  So, one of the things that's striking

22   right about this case is that is that in terms of the

23   treatment of the creditors they fall into one of two

24   categories, right, they're either an expressly consenting

25   creditor because they're holders of funded debt that has

1  agreed to it or they're unimpaired.

2          MS. CASEY:  Correct.

3          THE COURT:  So, when you think about releasing

4  claims against a third party that relate to the debtors

5  conduct the fact that the claim against the debtor -- you're

6  a contract counterparty that you just described as unimpaired

7  in this plan.  So, its one thing to say, yeah, they're

8  getting 4 cents on the dollar out of the estate; its nuts to

9  think of them as releasing the third parties, but it's a

10  little bit less nuts, right, when they're unimpaired.

11          MS. CASEY:  And, Your Honor, as to the unimpaired

12  creditors we are not objecting to the release in its

13  entirety.  We are objecting to the timing when that release

14  should become effective.  I will start with that argument

15  since we're here.

16          THE COURT:  Okay.

17          MS. CASEY:  So, just as to the unimpaired

18  creditors our position is that in order to be unimpaired your

19  entire bundle of sticks has to ride through.  And one of your

20  bundles of sticks is able to assert that against an affiliate

21  who has provided a guarantee.  The timing --

22          THE COURT:  Yeah, except that doesn't -- not to

23  get all philosophical, but since you started, doesn't the

24  Third Circuit case law like PPIE and the like that talks

25  about impairment as being the impairment of your claim,

1  right, which is just your allowed claim against the estate,

2  cut the other way for the purposes -- I understand there may

3  be reasons.  When I actually think about third party releases

4  not to get all hung up on the meaning of unimpaired, but just

5  to be the pointy head that some people think I am, isn't --

6  for the purposes of talking about what it means to be

7  unimpaired isn't it right that prejudicing your rights to sue

8  a third party isn't what the code means by impairment, at

9  least under Third Circuit law.  One could make a contrary

10 argument as to whether the Third Circuit case law is

11 correctly decided, that is not a line of argument we hear in

12 this Court.  We presume that that is the law.

13         MS. CASEY:  And I know Your Honor has heard this,

14 and its -- I think its -- well, there is also a provision

15 that the discharge of the debtor doesn't discharge a third

16 party.

17         THE COURT:  524(e), correct.

18         MS. CASEY:  So, when you add them all together and

19 you have them getting this third-party release before they

20 have received payment on their claim.  And if we were here --

21 this is an unusual case, as they said.  If we were here at a

22 standard disclosure statement hearing or the U.S. Trustees

23 Office had time to actually look at everything --

24         THE COURT:  Understood.

25         MS. CASEY:  -- we would have objected both on that

1  the release should not be effective until they have received

2  payment in full, but we would have also objected to the

3  notice because the notice says your unimpaired and the only

4  place where it tells people that their release is effective

5  immediately at the effective date is the use of the defined

6  term "effective date" in the legalese and no definition of

7  that effective date.

8         I think that the notice therefore in this

9  particular case, unfortunately, we weren't able to handle

10  this before it went out did not --

11         THE COURT:  That's the nature of a prepack.

12         MS. CASEY:  -- appropriately inform the unimpaired

13  creditors that your releasing all of these parties including

14  potential guarantors, including potential people who are,

15  otherwise, liable on the claim immediately even if you

16  haven't been paid.  And if the debtor defaults on their plan

17  obligations you have lost that right to do it.  So, in

18  addition to the substantive objection that the release should

19  not be effective until the payment has been made, we also

20  have the objection that the notice was not sufficiently clear

21  that people would have to understand.

22         First of all, effective date was not defined in

23  the notice and second of all it wasn't discussed in plain

24  English that what you are doing is you are giving up your

25  rights to go after these third parties and taking the risk

1  that the debtor doesn't pay.  So, that is an additional

2  reason why we think as to the unimpaired creditors the third-

3  party releases should not be effective until they have

4  received payment.

5          On the equity holders, on the other hand, now,

6  Your Honor, we are aware of Your Honor's opinion and we have

7  not objected as we would normally object to all of the third-

8  party releases in this case and we have narrowed it to the

9  equity holders who are not receiving any consideration.  The

10  way we view this, to put it in what we believe is Your

11  Honor's rulings, is this is something that would not pass

12  muster. It's not something that could be confirmed, could not

13  be confirmed and a party has an obligation to raise their

14  hand.

15          We see this as a plan saying all equity holders

16  will provide $250 to the American Red Cross.  These are

17  equity holders have to give something up of potential value

18  without receiving anything in return.  And under the Third

19  Circuit case law that consideration is required for releases,

20  under general contract case law that consideration is

21  required for a contract to be enforceable it's our position

22  that an opt-out for parties who are receiving no

23  consideration is not an appropriate procedure because under

24  the applicable facts that is not something that could occur.

25  That is not consistent with case law.  They shouldn't have to

1 │ object to something that is not, otherwise, permissible.

2 │         So, that is why we say now there was 89 percent of

3 │ the equity holders who are parties to the RSA who have signed

4 │ on. I believe some of them have different hats, some of them

5 │ are lenders, etc.  We are only talking about the public

6 │ shareholders.  Our objection is limited to the public

7 │ shareholders who are receiving nothing.

8 │         In this case, as you will see in Docket 149, we

9 │ very carefully went through what the evidence is.  Here, the

10 │ only arguable evidence as to what possible consideration that

11 │ these equity holders are receiving is these mutual releases,

12 │ but the debtors cannot make a record that any of these equity

13 │ holders -- that there are valid claims by the laundry list of

14 │ releasing parties against any of these public equity holders,

15 │ that the debtors have claims against these public equity

16 │ holders that have value, that the debtors' employees have

17 │ claims against these public equity holders that have value,

18 │ that the lenders have claims.  They just can't make that

19 │ record that there is any value.  So, it is our position that

20 │ a release without consideration is invalid and parties should

21 │ not have to object or opt-out of those releases.

22 │         As to the fraud, willful misconduct and gross

23 │ negligence, Your Honor, as to the debtors release that does

24 │ not include fraud, willful misconduct or gross negligence I

25 │ would like to point out that the release is all known and

1  unknown causes of action. We think that makes it even more

2  important that the fraud, willful misconduct, and gross

3  negligence carve out has to be here. As we said, if an

4  employee has been embezzling funds that the debtor doesn't

5  know about it is certainly not in the best interest of the

6  debtors' estate and it certainly would not meet the Zenith or

7  master mortgage factors to release those claims based on

8  fraud and willful misconduct and gross negligence.

9          THE COURT:  So, can we back up on this one. I

10  confess, this wasn't an issue of which I have previously

11  focused closely, but in terms of what is, sort of, standard

12  in this jurisdiction are the -- is what is being asked for

13  here something that is routinely addressed by my colleagues?

14          MS. CASEY:  I have -- to be honest, I have only

15  seen one other case where unknown claims of fraud were being

16  released and that was in front of Judge Owens.  She was not

17  comfortable with it and there had -- my recollection is there

18  was a last-minute agreement.  So, she didn't actually rule

19  upon it.

20          It is a very typical ask from the U.S. Trustee

21  that the releases include the fraud and willful misconduct

22  then they often do. I honestly cannot answer whether -- I

23  don't recall arguing this in front of anybody other then that

24  one Judge Owens case and I don't believe there is any written

25  opinions on it.

1          THE COURT:  Okay.

2          MS. CASEY:  We also have argued in the past and

3   been successful with some of the Judges that, at least, as to

4   those parties who are entitled to exculpation and exculpation

5   --

6          THE COURT:  Yeah, I understand that.  I appreciate

7   that as to exculpations for there I'm familiar with the

8   notion that that is mostly by principals of corporate law

9   limited to -- you know, if you have to carve out gross

10  negligence or willful misconduct that is analytically related

11  to -- it's a cousin of, but different from the releases here.

12         MS. CASEY:  So, our biggest concern -- you know,

13  we're concerned in general, but our biggest concern is that

14  including the unknown claims of fraud and willful misconduct

15  in both the debtors' releases and the third party releases

16  we're releasing claims that could have very good value, very

17  high value that under Master Mortgage and Zenith should have

18  a -- would fail within the reasonable litigation --

19         THE COURT:  So, can we talk about them separately

20  for a moment.  So, when two parties are agreeing to settle a

21  dispute, right, its not at all uncommon to give, essentially,

22  general releases that release claims that are known and

23  unknown.  The idea is we both know what we have and the

24  unknowns we can wrap our brain around.  And we are making a

25  decision that we're putting down our swords and if it

1   happened before today, we're done with it. If something

2   happens tomorrow, different thing, but any claims that we

3   have today, whether I know of it or don't know of it.

4          Look, if the settlement itself is obtained by

5   fraud that is a different thing also, but in the absence of

6   that the notion of grownup parties releasing known and

7   unknown claims strikes me as commercially standard, not

8   exceptional.  So, as to the debtor release where the debtor

9   and these third parties have decided to release -- its

10   subject to Court approve, sure, but that Court approval is

11   essentially is this a reasonable exercise of folks business

12   judgment that was done -- I mean, maybe you could say that it

13   deserves a closer look because the recipients are insiders,

14   but even so it's a sufficiently standard commercial term that

15   I have a harder time worrying about that then I do when we

16   don't have a person on the other side.

17          I guess my question is, to your mind is that

18   distinction a sane one?

19          MS. CASEY:  I would say that that distinction is

20   the same one as to the parties who there is evidence in the

21   record that there was a fulsome investigation.  The debtors

22   release goes far beyond just the release of other debtors and

23   the consenting stakeholders.  By including the releasing

24   parties, they are including all of the -- basically everybody

25   on the creditor matrix who did not opt-out. They are

1  including all of their employees, all of their rank and file

2  employees who they have not done an investigation of.

3              So, I think that is where we get to the scope of

4  this release is so incredibly broad that --

5              THE COURT:  Right, but its all related to claims

6  that derive from the debtor. Again, the givers of the

7  release, the releasors are either unimpaired as to the

8  principle party against whom the party runs or have

9  consented.

10             MS. CASEY:  For the third-party release.  For the

11 debtors release, the debtors are giving these broad releases

12 to people that they have not engaged in the investigation.

13 So, that would be where we would take that -- if we were

14 looking at any individual released parties that the debtor is

15 releasing, is there an appropriate record that that releases

16 is appropriate.

17             This is one of those things where the definition

18 of release parties gets longer and longer, and the release

19 itself gets longer and longer, and we do have Judge Shannon's

20 opinion that you have to live by what the release says and

21 when we have a debtor releasing a whole bunch of parties and

22 the evidence shows that they investigated a subset of those

23 parties we think that there should be --

24             THE COURT:  Okay.  I hear you there.

25             MS. CASEY:  Then as to the releasing parties

1 providing it for the fraud, willful misconduct and gross

2 negligence they haven't necessarily done that analysis in

3 doing this.  Again, the it would be nice to have this

4 discussion before the notices went out, but the notices did

5 not specifically state to them we're releasing claims of

6 fraud even if you don't know about it yet.

7 　　　　　THE COURT:  I hear you.  Look, the code

8 contemplates the possibility of a prepack, right.  So, I

9 appreciate when your office gets a chance to weigh-in

10 beforehand that that serves a salutary purpose.  That said,

11 you know, it's no one's fault that the code contemplates a

12 circumstance where you don't.  So, the question is what do we

13 do that -- I hear you, but I also think I can't and shouldn't

14 say you can't confirm a prepackaged plan period.  So, you

15 know, look, if there was something here that were wrong that

16 you would have fixed for them that would be on them. So, I

17 understand your point.

18 　　　　　MS. CASEY:  And I don't think carving out --

19 instead of not confirming it because it's prepack, but

20 carving out the unknown claims of fraud, willful misconduct,

21 and gross negligence, at a minimum, leaving in the known

22 fraud and willful misconduct that they want to release, but

23 not making them provide releases for unknown fraud, willful

24 misconduct, and gross negligence would seem to be an

25 appropriate remedy for not pointing that out.

1          The last point we have is that the -- and this one

2   may be one that is difficult to find a remedy for, but,

3   again, it's a prepackaged claim, we don't have schedules and

4   statements, and we have the definition of releasing parties

5   and released parties being mutual, those who are giving

6   releases are getting releases, those who are getting releases

7   are giving releases, and parties don't know who they're

8   releasing, they don't know what's happening here.  And the

9   debtors have proposed to put in the list of the eight parties

10  who have opted out, but, you know, we question whether

11  parties are going to know who is in and who is out within a

12  prepackaged case where you don't have schedules, you don't

13  have that kind of information, and all you have is who's

14  opted out.

15         And so, again, we would have objected at the

16  disclosure statement stage that it needs to be, you know,

17  more fulsome disclosures as to who it is that you are

18  releasing, but those are the four remaining objections that

19  equity holders, the public equity holders who are receiving

20  no contribution should not have to object to the plan in

21  order to have to be forced to give releases, that the fraud

22  and the willful misconduct and gross negligence should be

23  carved out of both releases, at least as to unknown claims,

24  the issue of who is releasing whom, and that the unimpaired

25  creditors should be able to retain their causes of action

1  against third parties until they have received payment in

2  full from the debtors.

3          Unless Your Honor has any questions, that's --

4          THE COURT:  Okay, so I've got the four categories.

5  One is the public equity holders, two is the fraud and

6  willful misconduct, three is who is releasing whom, and

7  fourth is the timing of the effectiveness of the release; is

8  that right?

9          MS. CASEY:  For the unimpaired creditors only.

10          THE COURT:  Right.

11          MS. CASEY:  We wouldn't -- right.

12          THE COURT:  Okay, I think I understand those

13  points.

14          MS. CASEY:  Thank you, Your Honor.

15          THE COURT:  Hold on, don't go anywhere.  Let me

16  think --

17          MS. CASEY:  Okay.

18          THE COURT:  -- let me think about whether I've got

19  -- no, I understand your position.  Thank you, Ms. Casey.

20          MS. CASEY:  Thank you.

21          THE COURT:  Okay.  So, Mr. Hunter, let me -- there

22  are two things that where I think I have questions in light

23  of what Ms. Casey said.

24          First, I guess, I'm interested in hearing about as

25  to the -- hold aside the debtor release, which I think of as

1 analytically separate, but as to the third party release, I

2 guess I'm interested in understanding if there's authority

3 about applying that in the context -- I understand the

4 analytic point, but just as a jurisprudential matter, if

5 there's authority about third party releases, including

6 claims for fraud and willful misconduct.

7          MR. HUNTER:  Your Honor, in our brief, footnote

8 223 and footnote 225, we cite to a few cases.

9          THE COURT:  I guess what I'm interested in is, in

10 addition, if there were -- I'm sure -- I recall your pointing

11 me to some orders --

12          MR. HUNTER:  Yeah.

13          THE COURT:  -- in which that's been done, but I'm

14 not -- I don't really care so much about whether there's a

15 written opinion as much as whether there's evidence that this

16 was actually a thing that was raised and considered and

17 resolved over someone's objection.  Whether that was done by

18 bench ruling or in writing doesn't make a lot of difference

19 to me.  And if the answer is no, that just hasn't come up,

20 that's a fine answer, I just -- that would be helpful to

21 understand that.

22          MR. HUNTER:  Yeah, the one we have, Your Honor, a

23 lot of is citing orders, you know, maybe it was or was not

24 contested, right --

25          THE COURT:  Right.

1          MR. HUNTER:  -- but we do have -- again, going

2    back to Chief Judge Sontchi, he's getting a lot of air time

3    today, but in Energy Future Holdings, this came up.  And

4    Judge Sontchi's quote goes to I think the point you were

5    making too, which is the difference between exculpation and

6    releases, and he said, "While such carveouts are necessary in

7    connection with exculpation, they are not actually required

8    for the Court to approve a release" --

9          THE COURT:  Okay.

10         MR. HUNTER:  -- and in here he approved a similar

11   release over a similar objection, Your Honor.

12         THE COURT:  Okay, okay.  So that's helpful.  Let

13   me ask -- can I ask an unfair question?

14      (Laughter)

15         THE COURT:  Just because I have -- I don't -- this

16   is the kind of thing that I would think I should have more

17   experience with, having done, you know, dozens of cases that

18   involve third party releases, but is this -- was the more

19   common practice for third party, consensual third party

20   releases to include these, or in -- if I were to poll ten of

21   my orders in which I've authorized this, but I find most of

22   them carved it out.

23         MR. HUNTER:  Your Honor, I think you'd find that

24   it goes both ways.  You know --

25         THE COURT:  Okay.

1           MR. HUNTER:  -- there are -- frankly, I think this

2 issue -- I think the plan that a debtor serves up usually

3 does not have this carveout, and then it's for another party

4 to raise --

5           THE COURT:  Okay.

6           MR. HUNTER:  -- and it depends on the facts about

7 whether you carve it out.

8           THE COURT:  Okay.  And it's one of those issues,

9 one of the many issues --

10           MR. HUNTER:  Yes.

11           THE COURT:  -- that goes away before I have to

12 think about it.

13           MR. HUNTER:  Yes, correct.

14           THE COURT:  Okay.

15           MR. HUNTER:  Yeah.

16           THE COURT:  All right, that's a perfectly fair

17 answer.

18           MR. HUNTER:  Yeah.

19           THE COURT:  Okay.  So I'm interested in your

20 response also to Ms. Casey's question about who is releasing

21 whom.  And maybe, as a practical matter, it's of relatively

22 little import given the circumstances of this case, but that

23 isn't a reason why I should get it wrong.  So help me, right

24 -- we can enter an order -- and, look, her point that there

25 should be some objective referent that is publicly available,

1  so that if a dispute were to arise later of does the release

2  extend to this claim, there's something where people could go

3  and figure out the answer to that question makes some sense

4  to me, so help me with that.

5          MR. HUNTER:  Yeah, I think we always planned to

6  make clear who opted out.  You know, we could -- I think her

7  point is to go the other way and it's --

8          THE COURT:  Well, just because -- look, this is a

9  prepack and, for good and sound reason, you've got an order

10 that says I don't need to file the usual schedules that would

11 normally be filed because after all, right, we're doing here

12 what we're doing.  And I have no quarrel with that, but that

13 has whatever consequences it has and one thing, one

14 consequence to that is, if I just issue an order that says

15 claims by creditors against other creditors are hereby

16 released, and if, you know, three years from tomorrow someone

17 files a lawsuit, you know, in the Superior Court of Delaware,

18 and someone responds to that by saying it's been released,

19 how is the Superior Court judge supposed to answer that

20 question, and why should I enter an order that puts another

21 judge in that situation.  That's what I'm concerned with --

22         MR. HUNTER:  Yeah.

23         THE COURT:  -- does that make sense?

24         MR. HUNTER:  Yeah, it does, and I think it's a bit

25 of a problem in a lot of -- just the way Chapter 11 releases

1  work in all kinds of contexts, right.  We're dealing with a

2  specific circumstance, there is a discharge of all claims,

3  there may be a release of a broad swatch of claims, and,

4  frankly, it's going to be on the beneficiary of that release

5  to be able to later show that they have the benefit of the

6  release.

7          THE COURT:  Okay.

8          MR. HUNTER:  So, I mean, you know, if we wanted to

9  give the beneficiaries the easiest playbook later, we would

10  go through all the trouble of basically filing --

11          THE COURT:  I hear you.

12          MR. HUNTER:  -- all the things we don't have to

13  file because it's a prepack.  You know, we choose to and I

14  think it is the practice to file a list of opt-outs, so you

15  know who definitely isn't included in that bucket, and it

16  will be on the party who's trying to rely on this release

17  later to be able to prove that this party did release that

18  claim.

19          THE COURT:  Okay.  Let me ask you another

20  question.  So you've read Arsenal, you understand how I think

21  about this.  I thought the job of your brief and quoting

22  everything I've ever said about it is a little creepy --

23      (Laughter)

24          THE COURT:  -- but you're obviously, from all of

25  that work, you're aware that sort of my view on this proceeds

1  from the premise that I live in the Third Circuit, that

2  Continental is good law in this court, and that I start from

3  the premise that because I live in a world in which there are

4  circumstances in which third party releases can sometimes be

5  appropriate and, therefore, such a release is just a plan

6  provision, and, therefore, it's incumbent on the party who's

7  affected by it to raise an objection.

8          My question is, did you spend as much time as I

9  did on Thursday and early Friday wondering how I would think

10 about this if we came here today and the law were different?

11 That's mostly rhetorical, but --

12     (Laughter)

13         MR. HUNTER:  I'm glad it's mostly rhetorical, Your

14 Honor.

15         THE COURT:  -- because I spent a lot of time

16 worrying about that on Thursday when I focused on it, but it

17 turns out we are where we are.

18         MR. HUNTER:  I did check this morning to see if

19 the Supreme Court --

20         THE COURT:  Today is not -- today is not --

21         MR. HUNTER:  -- issued their Purdue Pharma opinion

22 and see if that impacted my argument, Your Honor.

23         THE COURT:  Today is not a hand-down day.  Okay.

24 So I think you have answered my questions.  If there's

25 anything else you want to say in response, I'll give you --

1          MR. HUNTER:  Yeah, I mean, just maybe a couple

2  points, Your Honor.  I think, you know, the -- there was -- I

3  think there was a conflation that the RSA parties and the

4  people that released were different things -- or the

5  investigation was limited to RSA parties, not everyone that

6  was released, that's incorrect.

7          The special committee, which, you know, is the

8  debtors' fiduciary, I think the one who has the business

9  judgment to decide what to do, they investigated all claims

10  and causes of action that they think the debtors have.  They

11  looked at books and records, did interviews of management and

12  directors, and, you know, scoured everything they could find

13  to see was there anything of value both against RSA parties,

14  but against anyone else.  Was there someone who we never had

15  heard of and, when we looked at the books and records and

16  interviewed management, we found some claim, and so we should

17  carve that released party out.  And they looked for claims

18  that didn't involve gross negligence, fraud, willful

19  misconduct, and those that did, they looked for everything.

20  And the conclusion was there is nothing there in the context

21  of this plan with this consensus, it's appropriate to grant

22  the releases.

23          And so I think, you know, I just want to make it

24  clear that they looked at everything, and particularly,

25  because that's not always the case, that's a strong

1   justification for a broad release here, particularly a debtor

2   release, when you have an independent fiduciary whose sole

3   job it was to look for everything and look under every rock.

4              THE COURT:  Okay.  Thank you very much.

5              MR. HUNTER:  Thank you, Your Honor.

6              THE COURT:  So, Ms. Casey, can I come back to you?

7   So I thought the point you made about issuing this order and

8   it being unclear where it applied was a fair one, though I

9   also thought that Mr. Hunter's response was pretty good too,

10  so I want to give you a chance to respond to it.

11             His point is, look, release of a claim is an

12  affirmative defense and, if the beneficiary is going to have

13  a hard time proving the affirmative defense, well, that's on

14  the beneficiary.  And I shouldn't -- while I shouldn't sow

15  undue confusion into the universe, under the circumstances,

16  the world is imperfect and they'll get what they get, and if

17  someone is -- if the problem you identify means that there

18  might be someone who was intended to be the beneficiary of

19  this release who can't prove it up, then that is what it is.

20             So why isn't that a fair response?

21             MS. CASEY:  Well, to quote Judge Sontchi, we're

22  now arguing about how many angels can dance on the head of a

23  pin --

24             THE COURT:  To be sure, though this whole --

25             MS. CASEY:  -- and --

```
 1            THE COURT:  -- but this whole set of issues has a
 2   philosophical element to it, and that's no one's fault
 3   because we're all talking about claims -- what are we doing
 4   today about claims that probably don't actually exist and
 5   that might or might not someday be asserted.  So that's no
 6   one's fault, that's just the nature of the exercise.
 7            MS. CASEY:  I understand.  And I had an argument
 8   in front of Judge Gross a while ago about whether these
 9   releases extend to parties who have only received publication
10   notice, do we consider them to have consented --
11            THE COURT:  I understand.
12            MS. CASEY:  -- when they didn't get it.
13            THE COURT:  At least he was more pleasant to
14   appear in front of than I am.
15        (Laughter)
16            MS. CASEY:  And so I don't know if there is a way
17   to give the whole list.  I was thinking about it when you
18   said it, and my first response when you asked debtors'
19   counsel was, well, at least maybe the -- if there's a
20   certificate of service of who was served the notice of -- the
21   various confirmation notices, that would at least be start A
22   as to who did.  And then I thought, well, that doesn't --
23   that doesn't answer the question of somebody else get
24   publication notice, but I think that would be the start, is
25   there a certificate of service that lists everybody who
```

1  received all of the notices under the plan.  It's probably

2  over broad, some of them probably don't fall within the

3  definitions, but that would at least be the start of where it

4  is.

5          THE COURT:  Okay, but that would help whoever has

6  the burden of proving it --

7          MS. CASEY:  Right.

8          THE COURT:  -- to prove it and they'll either

9  succeed or they'll fail, but what I found persuasive about

10 Mr. Hunter's point isn't so much that they will win or lose,

11 but that there's nothing incongruous about the notion that a

12 party who bears the burden on establishing an affirmative

13 defense, has whatever evidence they have, and they'll either

14 win or they'll lose, and that it's not job to make that

15 immaculate today.

16         MS. CASEY:  And I think the U.S. Trustee's

17 position is less who gets to defend it and more who gave one

18 that didn't know they were giving it.  So our position is

19 more --

20         THE COURT:  I see.

21         MS. CASEY:  -- at the disclosure statement stage,

22 we would say you need to let these people know before they

23 decide whether they're opting in or opting out --

24         THE COURT:  All right.  So, now, since you've

25 picked that fight -- so, look, imagine I had the following:

1   Imagine I had a plan in front of me and what it said is all

2   of the debtors' executory contracts, whether listed on

3   Schedule A or not, are hereby assumed.  And the cure amounts

4   for those contracts are what's listed on Schedule A or, if

5   it's not on Schedule A, it's zero.  And that goes out and

6   it's served on every conceivable contract counterparty and

7   none of the counter -- there's a counterparty out there who

8   is in fact the contract counterparty, they're not on Schedule

9   A.  They get notice of this and they don't object.  Is there

10  anything wrong with the Court signing that order, or should

11  we not sign that order because we might be affecting the

12  rights of someone who had actual notice and didn't object.

13          MS. CASEY:  That's interesting because the U.S.

14  Trustee tries to make sure that we get provisions in things

15  before they go out, or object to them or have them do that,

16  so that we don't have that situation.  And it is problematic

17  because is it sufficient notice.  I mean, if they got notice

18  of it --

19          THE COURT:  Actual notice --

20          MS. CASEY:  -- actual notice --

21          THE COURT:  -- they got it in the mail.  It was a

22  piece of paper addressed to them.

23          MS. CASEY:  -- and it said, clearly and

24  conspicuously, if you've received notice and you're not on

25  this list, you are zero, that's the same, I would assume, as

1  being on the list.  I mean, they could have put them on the

2  list and said zero.

3          THE COURT:  And so you have no problem, right --

4  look, I don't mean to engage in a philosophical discussion,

5  but you've got -- because that's also my view that it's

6  incumbent on that person, if they get actual notice, they're

7  affected by a plan provision, if they don't like it, they've

8  gotten it -- if they don't get it, they can always come in

9  and say, I'm not bound by it because I didn't get it.

10         MS. CASEY:  Right.

11         THE COURT:  If they did get it and there's

12 something in there they don't like, the obligation is on them

13 to come to court and tell me what they don't like about it.

14 And if the debtor can't meet its burden of establishing, you

15 know, that it can assume this contract because it cured all

16 defaults, then they can't assume the contract.

17         MS. CASEY:  Right.

18         THE COURT:  And the principal, like, you know,

19 thought of Arsenal is that a third party release is no

20 different, at least today in light of Continental.  It could

21 be different in a different jurisdiction, but -- and so, if

22 you -- and, again, let me say to begin that your office's

23 help in thinking through this and pushing on it is really

24 appreciated, and so you may not able to tell from how rarely

25 I've ruled in your favor, but it's really helped me think

1  this through, and that's your job and you guys do it

2  terrifically and I'm really tremendously appreciative.  But

3  having concluded that a third party release is really

4  analytically the same as that, then -- if I go that far, then

5  what's left of your argument?

6           MS. CASEY:  That, Your Honor, is why our argument

7  is that the disclosures were not adequate and not the

8  substantive --

9           THE COURT:  I understand.

10          MS. CASEY:  -- that the parties had to know who it

11 was they were releasing before they did it.

12          So our argument was specifically on whether the

13 disclosures were adequate, and I know that it's tough now

14 when the train is barreling down the mountain to say that

15 wasn't sufficient --

16          THE COURT:  I understand, but you've got a fair

17 argument to say it's on them to set this train barreling down

18 the mountain.

19          MS. CASEY:  Right.

20          THE COURT:  So that doesn't get held against you.

21          MS. CASEY:  I gotcha.  So that is our argument.

22 Our argument is that that statement in the cure notice saying

23 that if you're not on here is zero wasn't necessarily there

24 in language that these people could understand.  You know,

25 it's -- we would think, just like we usually have them say a

1  giant box right in the front, in plain English it says,

2  you're giving this release, it's really important, read it.

3  So they don't get a document that has all this dense legalese

4  in it, they know, oh, I have to do something.  We also wanted

5  to say and, by the way, if you don't opt out, you're

6  releasing people that you may not know that you're releasing.

7       THE COURT:  Okay.  Can I ask another unfair

8  question?

9       MS. CASEY:  Of course.

10       THE COURT:  This is a great job, I get to do that.

11  If someone calls you up and says I'm filing a prepack and I'm

12  about to start soliciting, I'm going to file this case in 45

13  days, I'm going to start soliciting tomorrow, here's the

14  language that we're intending to include in our solicitation

15  materials, do you take that call?

16       MS. CASEY:  We absolutely do and, if I had caught

17  this, I would have asked for it at that time, but in the, you

18  know, 24 to 48 hours or whatever we had before this I hadn't

19  caught this issue.  In fact, to be completely frank, I hadn't

20  caught it and somebody else had said, oh, you have this in

21  here.

22       THE COURT:  I see.  So, again, look, I'll only

23  make the decision based on what's in the record.

24       MS. CASEY:  Right.

25       THE COURT:  So phone calls that happened that

1  aren't before me are not going to base my decision, but just

2  out of curiosity, before these solicitation materials went

3  out, someone said to you --

4          MS. CASEY:  Oh, we actually negotiated quite a bit

5  of changes to the opt-out --

6          THE COURT:  I see --

7          MS. CASEY:  -- forms and stuff --

8          THE COURT:  -- well before the --

9          MS. CASEY:  Yeah.

10          THE COURT:  -- case was filed.  Okay, okay.

11  Again, that's not in the record, but it's helpful just by

12  background.

13          MS. CASEY:  We don't try to do a gotcha at the

14  confirmation hearing and saying --

15          THE COURT:  No, I understand.  No, I --

16          MS. CASEY:  -- we would have objected to this.

17          THE COURT:  -- just so you understand, I was

18  operating on the assumption that you first learned of all of

19  this, you know, on or immediately before the case was filed.

20          MS. CASEY:  To be clear, the solicitation, I

21  believe, of the voting parties went out without our input,

22  but they're --

23          THE COURT:  Okay.

24          MS. CASEY:  -- they're not parties that we --

25          THE COURT:  I see.

1          MS. CASEY:  -- would necessarily feel the need --

2          THE COURT:  Got it, got it, got it.

3          MS. CASEY:  -- to change the documents about.

4          THE COURT:  Okay.  All right, very helpful.  Thank

5    you very much.

6          Okay.  Anything else I should understand?

7          MS. CASEY:  Nothing from me, Your Honor.

8          THE COURT:  Okay.  Mr. Hunter, anything further?

9          MR. HUNTER:  Just briefly, Your Honor, unless you

10   have any questions, I do agree that, you know, Ms. Casey's

11   office works on this a lot before we file.  Prepetition

12   solicitation often has to start before that engagement period

13   starts, but a lot of work happened prepetition.

14          These were the -- this was one of the slides I

15   wanted to go over before, you know, this is the attempt at

16   plain English, right?  All the legalese that a lawyer could

17   sift through to understand the import of releases sits behind

18   this, but we do try to put a plain English version right up

19   front, cut to the case.  You know, there's a lot of bold,

20   italic language behind this, and maybe you want to throw this

21   thing away, but here is the snapshot to get you to read

22   further because your rights may be impacted.  And, if nothing

23   else, the takeaway from all this is we'll make sure we run

24   this provision specifically by the U.S. Trustee in future

25   cases to hopefully align on this issue the best we can.

1                THE COURT:  Okay, that sounds like a good

2   practice.

3                MR. HUNTER:  Thank you, Your Honor.

4                MS. CASEY:  This was our negotiated language,

5   wasn't it?

6                MR. HUNTER:  And there's a good chance that --

7   yeah, exactly --

8                THE COURT:  Got it.

9                MR. HUNTER:  -- so, you know, it has the input of

10  the Office of the United States Trustee --

11               THE COURT:  Okay.

12               MR. HUNTER:  -- so even better.

13               THE COURT:  Okay.  So I think I am actually

14  prepared to rule, unless it -- well, let me -- before I jump

15  the gun, let me ask, is there any other party in interest

16  that would like to be heard with respect to any matter as it

17  relates to confirmation of the plan?

18       (No verbal response)

19               THE COURT:  Okay, seeing none.

20               So, look, I'm going to enter the confirmation

21  order in its current form.  I'll just start with the punch

22  line.  I really do appreciate the good and hard work that's

23  been done by all of the parties and the eminently fair points

24  that are made by Ms. Casey and her office.  And I view this

25  ruling as being sort of context-specific and so shouldn't

1   mean that I wouldn't in a different factual setting not put

2   sort of different weight on different of the variables here

3   in this equation.

4           Sort of at the outset, let me say that, you know,

5   my basic frame of thinking about this is what I said in

6   Arsenal.  I'm sure I said it in ways that were more

7   meandering and philosophical than necessary, but I was sort

8   of thinking out loud, it sort of came across, but I do think

9   my back-and-forth with Ms. Casey about thinking about this

10  like that executory contract case does capture how I think

11  about this, which is to say it's a plan provision like any

12  other and that primarily the party who's affected by a plan

13  provision has got to come to court and say I've got a problem

14  with that plan provision.  And I view the opt-out box as

15  essentially being a shortcut for I object to the plan, and

16  the debtor responding by carving out the objector from the

17  third party release.

18          And so it seems to be a helpful mechanic to have

19  an opt-out box, but that the real way to think about it is

20  there's a plan provision, the plan provision might or might

21  not comport with applicable law.  If there's someone who

22  wants to be heard to say you're improperly affecting my

23  rights, as Judge Sontchi explained, as Judge Drain explained

24  in Tops, it's incumbent on the affected party to come to

25  court and say this plan can't be confirmed because it has

1  this unlawful provision, and the debtor then has the choice

2  that they can either prove that the provision is lawful by

3  showing that you meet Continental, or you could say, you know

4  what, I'm not going to bother doing that, I'm going to carve

5  out this objector, and I'm only going to enforce this

6  provision against those who didn't object.  And so that's how

7  I think an opt-out works.

8         And that way of thinking about, I do think --

9  first of all, Ms. Casey is a hundred percent correct that

10  that depends on the adequacy of the disclosure and, if it's

11  not disclosed in a way that's adequate, then none of what I

12  just said makes any sense.  Here, I'm not saying that the

13  disclosure is perfect, but I do think that it sufficiently

14  apprises creditors of what they need to know in order to, if

15  they had an issue with it, raise that issue in court.

16         So I'm comfortable with it.  Look, I do think --

17  this won't surprise anyone, but better disclosure is better.

18  And in concluding that this disclosure is sufficient in this

19  case, that conclusion is against the context of a plan that

20  un-impairs most of the creditors.  I understand there is the

21  issue of the public equity holders, but in light of the

22  strong degree of consensus for this plan and the

23  circumstances presented here, I'm -- and the language of the

24  disclosures that we have, I'm comfortable that in this

25  context it's sufficient.  And it is, though -- I do want to

1  repeat -- a hundred percent correct that my rationale for the

2  permissibility of this does depend on the adequacy of the

3  disclosures and, if there's ever an issue where someone wants

4  to be heard to say this disclosure isn't sufficient to bind

5  the creditors to this choice -- again, typically, you have a

6  -- the best time to do that would be at a solicitation

7  motion, not, you know, after it's all gone out the door, and

8  I understand in a prepack the world is slightly different --

9  I think the standard is fundamentally the same, but I'm

10 satisfied that on these facts this is sufficient, though I

11 appreciate the helpful and fair argument that's made to the

12 contrary.

13        So I do think, though, that basic rationale

14 responds to each of the objections as to enforcing the

15 release as against the public equity holders, I do think that

16 it's a plan provision.  They're a party in interest in the

17 bankruptcy case, they received whatever notice they received,

18 I'm satisfied it was sufficient to put them on appropriate

19 notice that they would then be obligated to raise an

20 objection.  And I think that -- I think, for the reasons that

21 -- as Mr. Hunter described, that Judge Sontchi set out in

22 EFIH, that it does impose the burden on them to come in, I

23 think the same thing as it relates to the claims for fraud

24 and willful misconduct.  And I was -- I confess, took the

25 bench with the view that, as to the debtor release, I was

1  going to be okay with it and was more on the fence as to the

2  non-debtor release.

3        For what it's worth, I find -- I know there's case

4  law that says you give careful scrutiny to debtor releases,

5  even in the context in which the party the debtor is

6  releasing are independent third parties, and I find that a

7  little hard to square with the sort of fundamental premise

8  that we begin with a presumption of the diligent exercise of

9  business judgment by the debtor.  A claim that the estate

10 might have against somebody else is just value in the estate

11 and, if the estate fiduciary chooses to trade that value for

12 some other benefit, except for -- obviously, when you deal

13 with insiders, it all gets closer scrutiny, but I don't

14 really get the special solicitude for debtor releases of

15 independent third parties.

16       Again, I'll apply the law as it's handed down to

17 me, I'm not saying it's all up to me, but I start with the

18 premise that, if the debtor is releasing estate causes of

19 action, in the absence of evidence that the debtor hasn't run

20 an appropriate process for exercising its fiduciary duties,

21 that we start with the premise that the debtor's business

22 judgment is what it is.  Releasing the claims of -- causing

23 third parties -- causing creditors to release claims against

24 third parties that they would have for claims of fraud or

25 willful misconduct did strike me as a closer, harder

1    question, but I am satisfied that the rationale of <u>EFIH</u> does

2    pick that up and that there really isn't an analytically

3    sound basis, unlike in the context of exculpation, which is

4    -- it's sort of a different creature as a matter of law where

5    corporate law principles limit the scope of what can be

6    exculpated, here I think the rationale applies.

7            On the issue of who is releasing whom, I found

8    that exchange with Counsel on both sides to be extremely

9    helpful and am satisfied that being the beneficiary of a

10   third party release gives you an affirmative defense in some

11   later litigation that, to the -- I think that Ms. Casey does

12   a fair point -- does a good job of pointing out that there

13   may be circumstances in which it won't be crystal clear that

14   someone who was intended to be the beneficiary of that

15   release actually can show that that claim has been released.

16           Again, I make this ruling against the backdrop of

17   this seeming particularly to be a case in which we're dealing

18   with a particularly hypothetical problem, one that seems

19   particularly unlikely to actually arise in the real world,

20   and what I would do if confronted with this question when we

21   knew the claim was out there could be a different thing, but

22   in a world in which it's as hypothetical as it is, I'm

23   comfortable with the analytically correct, even if

24   unsatisfying answer that is, that it's just the burden on the

25   party who wants to assert the defense to prove it and, if

1   they can't prove it, then they don't get the benefit of it.

2           And as to the timing of the release, there too I

3   think just the analytic construct is -- you know, the premise

4   is that the creditor has chosen not to object to a release

5   that becomes effective upon the effective date of the plan

6   and once you conclude, as I have, that that's the way -- the

7   frame for thinking about it and that the disclosure has been

8   adequate, then I no longer see a basis for essentially

9   rewriting what it is that the plan did.

10          So that's where I am, and I think I'm satisfied

11  and would be comfortable signing the order, unless there are

12  open questions that the parties have or someone wants to say,

13  Judge, you forgot about this really obvious thing.  And you

14  won't hurt my feelings by saying that.

15          MR. HUNTER:  From the debtors' perspective, no,

16  Your Honor.  I think -- we were exchanging emails just before

17  we walked into court, so I will just want to make sure that

18  Ms. Casey is okay with the resolution baked into both

19  documents, which I think have been emailed to chambers, but

20  besides the form of order I think we're okay

21          THE COURT:  Okay.  Ms. Casey?

22          MS. CASEY:  I do -- I apologize --

23          THE COURT:  Don't apologize.

24          MS. CASEY:  -- if I'm out of turn -- the release

25  by the third parties releases the debtors, notwithstanding

1   anything contained in the plan to the contrary.  I do think

2   there needs to be something that makes it clear that

3   unimpaired creditors are not releasing claims against the

4   debtors.  I don't think that was your intent because they

5   can't be unimpaired and ride through if they're releasing the

6   debtors, but I just noticed --

7               THE COURT:  Hold on.

8               MS. CASEY:  -- that as I look down --

9               THE COURT:  Unimpaired creditors are releasing

10  their claims against the debtor, right.  So that's obviously

11  a mistake because, if they're unimpaired, their rights

12  against the debtor are what they are.

13              MS. CASEY:  It has to go through.  So I don't

14  think that was the intention, but as I just looked down, it

15  says notwithstanding anything under the plan, and I thought

16  it had said except for the stuff in the plan.

17              THE COURT:  I agree.

18              MS. CASEY:  So I just want to make sure that

19  that's going to --

20              THE COURT:  All right.  So I should have caught

21  that, but I didn't.  So, thank you.

22              MS. CASEY:  Unless they're going to point out that

23  there's language somewhere else that carves it out.

24              THE COURT:  Mr. Hunter -- and this is not meant to

25  be a pop quiz, so if you want --

1          MR. HUNTER:  No, that's certainly not the intent,

2   Your Honor.  You know, it's clear, it's meant to be clear

3   throughout the plan that the unimpaired creditors, their

4   claim exists, they're releasing, to your point, other rights

5   they may have, other claims they may have against the debtors

6   or other parties.

7          You know, I think the last proviso in that release

8   section is meant to say just that, which is, notwithstanding

9   anything else in this release section -- a lot of

10  notwithstanding any else, but this is at the end -- nothing

11  is releasing the obligations of the parties under this plan,

12  that's meant to --

13         THE COURT:  All right.  Well, that's sort of

14  circular, though.

15      (Laughter)

16         MR. HUNTER:  Well, the release exists, and then,

17  at the end, notwithstanding the release that you just read,

18  it's not meant to release the obligations that arise out of

19  this plan.

20         THE COURT:  All right.  So, look, I don't mean to

21  create busy work, but in -- I guess what -- let me -- if

22  there's a like time-is-of-the-essence point such that my

23  suggestion is not going to work, let me know, but I would

24  encourage the parties to talk about this, and if you can

25  submit a form of order under certification after working

1   through it, or if there's a disagreement and you want to

2   submit competing forms of order, I'm happy to do that.  But

3   it seems to make more sense to let you iron this out than for

4   me to start making it up from the bench.  So --

5          MR. HUNTER:  Yeah, there's no disagreement on this

6   point conceptually.  So we'll find some language that works

7   between the parties --

8          THE COURT:  Okay.

9          MR. HUNTER:  -- and submit that.

10          THE COURT:  Okay, very well.

11          Ms. Casey, I think that's agreeable from your --

12          MS. CASEY:  That's fine.

13          THE COURT:  Okay.  Okay, is there anything else

14   that anyone would like to raise while we're here this

15   afternoon?

16          MR. HUNTER:  Not from the debtors, Your Honor.

17          THE COURT:  Okay.  Let me again thank the parties.

18   This is -- look, this cluster of issues that we talked about

19   this afternoon, obviously, may or may not have to be

20   rethought depending on what happens in the next couple of

21   weeks.  And so, you know, to the extent the law changes, then

22   everything I've said changes, and so we'll deal with that if

23   and when that were to arise.  And I'm not here to make any

24   predictions, but I don't want this ruling to in any way

25   discourage anyone from saying, if the law changes, then

1  everything is up for grabs.

2          What I'm ruling today is based on what I've said,

3  which is based on what I think the law is today, and if it

4  changes, it changes.  And even in light of where we are, I

5  found this exchange to be extremely helpful, and the points

6  that were raised to be all totally fair points, and it was

7  very beneficial to me to have you raise this in front of me.

8  So I want to thank everyone for that.

9          Okay.  So, with that, we will enter the -- let me

10 thank and congratulate the parties for an awful lot was done

11 here that didn't require any work from me.  And this you've

12 often heard me say, when you hand me agreed orders, it very

13 much reduces, that doesn't eliminate the possibility that

14 I'll do something wrong.  So I appreciate all of the parties'

15 good work there in reaching consensus and that the issues you

16 brought me were all totally fair issues to bring, and we will

17 enter the confirmation order when it's submitted under

18 certification.

19          And, with that and my thanks to all, we are

20 adjourned.

21          MR. HUNTER:  Thank you, Your Honor.

22      (Proceedings concluded at 2:14 p.m.)

23

24

25

1                          CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    June 28, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    June 28, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25